NOT DESIGNATED FOR PUBLICATION

No. 117,157

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of
M.H.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Johnson District Court; KATHLEEN SLOAN, judge. Opinion filed December 1, 2017.
Affirmed.

*Richard P. Klein*, of Olathe, for appellant natural mother.

*Jacob M. Gontesky*, assistant district attorney, and *Stephen M. Howe*, district attorney, for
appellee.

Before GARDNER, P.J., PIERRON and ATCHESON, JJ.

PER CURIAM:  Mother appeals the district court's termination of her parental rights
to her son, M.H. Father's rights to this son were also terminated, and he brings a separate
appeal. Mother contends that the district court erred in finding her an unfit parent, in
finding her unfitness would not change in the foreseeable future, and in finding
termination is in the best interests of her child. She also contends she failed to receive
proper notice of the proceedings against her. Finding no error, we affirm.

*Factual and procedural background*

M.H. is a child under the age of 18, born in 2004. In September 2009, when he was five years old, he was adjudicated as a child in need of care (CINC) due to conditions of the home and the family's resistance to services. M.H. was removed from the home and placed in foster care but was reintegrated with his parents by October 2010.

In early 2014, Mother and Father entered pleas of guilty to certain counts of a 22-count federal indictment for various types of fraud. Mother is incarcerated in a federal medical center in Texas. Her earliest possible release date is in November 2020. Father is incarcerated in a federal correctional facility in Indiana. His earliest possible release date is in February 2022.

Before the parents' imprisonment, Father took M.H. to G.B., an acquaintance of his, and asked G.B. to take care of him while Father was incarcerated. Father signed some type of permission for M.H. to stay with G.B.'s family, which consisted of G.B., his wife, and their three children, two of whom had special needs.

In July 2014, the Department for Children and Families (DCF) received a report that M.H. had been abused while in foster care in 2009-2010. DCF investigated and found the report unsubstantiated. DCF received another report regarding M.H. in March 2015—a nonabuse and neglect report regarding the relationship between M.H. and G.B. DCF assessed the situation but no services were recommended because M.H. was already in therapy.

On December 14, 2015, G.B. contacted police to have them remove M.H. from his home and reported the following information to them:  He had been caring for M.H. for approximately a year and a half, since Father had left him there before going to prison; M.H. had been abused and tortured by his parents and raped by his foster parents in

Missouri; Father was a martial arts expert who punished M.H. if he showed any emotion; M.H. talked about killing his parents and foster parents, and it was his life's mission to do so; M.H. posed a safety risk to G.B.'s own children; and he and his wife no longer felt equipped to care for M.H. due to his mental health needs and his threats of violence.

Police took M.H. to the Juvenile Intake and Assessment Center and interviewed him. He stated he was determined to get revenge on his parents and foster parents he was "consumed" with this idea and did not care if he hurt others in his desire to obtain revenge. M.H. provided graphic descriptions of killing his parents and foster parents, but admitted he did not have a plan to do so. He claimed that if he could, he would go to school and kill everyone to show his parents he is serious. Later that day, M.H. was interviewed by a DCF social worker. M.H. told her he did not feel angry but had violent thoughts of killing his parents and foster parents. He disclosed that he had cut himself with a knife in an attempt to commit suicide. M.H. consistently reported this same information to multiple professionals who spoke with him, including a police officer, a juvenile intake specialist, and the DCF social worker. During M.H.'s stay with G.B.'s family, he had been admitted to Marillac as an in-patient on two occasions and had a seven-week in-patient stay at Kids TLC.

On December 15, 2015, the State filed a petition to adjudicate M.H. a CINC. The same day, M.H. was placed in the temporary custody of the Secretary of DCF due in part to an emergency. At the CINC hearing, Mother participated by telephone and was represented by her attorney. Father did not participate but was represented by his attorney. The district court found clear and convincing evidence that M.H. was a CINC and adjudicated him as such. The court also found reintegration with the parents was not a viable option.

On July 7, 2016, the district court held a trial on the motion to terminate parental rights. Both Mother and Father were represented by counsel, and both were allowed to

participate by conference call. Mother was otherwise occupied when the trial began but her attorney indicated she had Mother's consent to proceed in her absence. Mother called in and joined the proceeding after approximately one hour.

Before hearing testimony, the district court took judicial notice of the files in the 2015 CINC case, as well as the files in the 2009-2010 CINC case, a previous child support case, and the federal criminal cases regarding the parents' convictions. The district court accepted into evidence the following exhibits: (1) the parents' federal indictment; (2) the second superseding indictment; (3) the amended judgment regarding Mother; and (4) the amended judgment regarding Father.

Testimony was given by the DCF social worker assigned to M.H.'s case, by M.H.'s case manager from KVC Behavioral Health System, and by Father. Father's testimony focused largely on his appeals in his criminal case. Father did indicate he had family members willing to care for M.H., and specifically named J.G., his half-sister on the East Coast. Mother chose not to testify.

On July 26, 2016, the district court issued a memorandum decision. The court summarized the CINC history of M.H. and the circumstances surrounding his present status as a CINC. This included his parents' long-term incarcerations, the resignation of the custodian Father had arranged for M.H. while they were in prison, and M.H.'s mental and emotional issues, including his homicidal ideation toward his parents. The court found that M.H. has "significant behavioral and mental health issues, and his needs in both regards are substantial." The district court found clear and convincing evidence to find Mother and Father unfit as parents pursuant to K.S.A. 2016 Supp. 38-2269(b)(5) for their felony convictions and imprisonment, and K.S.A. 2016 Supp. 38-2269(b)(8) for their lack of effort to adjust their circumstances, conduct, and conditions to meet the needs of M.H. The district court found these conditions of unfitness were unlikely to change in the immediate or foreseeable future. The district court noted that M.H. had no

4

relationship with his parents, and that he did not want one. The court found that a permanent custodianship was not the best permanency goal for M.H., in part, because of his need for insurance and possible subsidy obtained through adoption, but also because M.H. strongly opposed contact with his parents. Finally, the district court found it in the best interests of M.H. to terminate the parental rights of Mother and Father.

Mother timely appealed the district court's judgment.

*The governing law*

A parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Given the inherent importance and unique character of that relationship, the right has been deemed fundamental. Accordingly, the State may extinguish the legal bonds between parent and child only upon clear and convincing proof of parental unfitness. K.S.A. 2016 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

On appeal, we review a district court's decision to terminate parental rights to determine if, after reviewing all of the evidence in the light most favorable to the prevailing party, a rational fact-finder could have found it highly probable that the parent's rights should be terminated. *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). The evidence must be clear and convincing. K.S.A. 2016 Supp. 38-2269(a). When determining whether factual findings are supported by clear and convincing evidence, an appellate court does not weigh conflicting evidence, pass on the witnesses' credibility, or redetermine questions of fact. *In re M.H.*, 50 Kan. App. 2d at 1170.

5

*Mother's unfitness due to her conviction of a felony and imprisonment*

We first address Mother's contention that the evidence did not support a finding of unfitness under K.S.A. 2016 Supp. 38-2269(b)(5)—"conviction of a felony and imprisonment."

Mother does not argue that she was not convicted of a felony or imprisoned. She argues that the court's finding of unfitness was improper because the time frame for her ability to appeal her conviction is not yet final. But the plain language of K.S.A. 2016 Supp. 38-2269(b)(5) requires the district court to consider "conviction of a felony and imprisonment." This language does not require a determination that the conviction is final—a determination that may take years. Instead, in support of her argument, Mother cites to federal criminal procedures and timelines for direct and collateral appeals. Further, Mother does not cite any authority in support of her argument that the termination of her parental rights should be stayed pending the outcome of a collateral appeal "if one is filed." Failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue. *University of Kan. Hosp. Auth. v. Board of Comm'rs of Unified Gov't*, 301 Kan. 993, 1001, 348 P.3d 602 (2015).

Mother admits that her direct appeal was unsuccessful and her convictions were upheld, but she contends that she still has time in which to file a collateral appeal. She argues that waiting for the outcome of her habeas corpus petition—if she files one, and if it is successful—will prevent her from having to reestablish her parental rights when her burden to do so at a future date would be heavier.

Mother fails to demonstrate how waiting additional time is in M.H.'s best interests, especially in light of the understanding that the foreseeable future is examined through the perspective of the child, and children have the right to permanency within a time

frame reasonable to them. *In re M.H.*, 50 Kan. App. 2d at 1170-71. M.H. was taken to stay with G.B.'s family in approximately March 2014 when he was barely 10 years old. He has been in the custody of the State since December 2015 when he was 11 years old. As of the hearing of this appeal, M.H. has been in the State's custody for nearly two years and is approaching his 14th birthday. M.H. has the right to permanency within a time frame that is reasonable to him. See 50 Kan. App. 2d at 1170-71. Further, incarceration is a negative factor where, as here, it is the cause of further delay in the proceedings that are not in the best interests of the child. 50 Kan. App. 2d at 1172.

Mother primarily claims that the State improperly relied solely on the length of her incarceration. We agree that the court must look to more than the length of a parent's incarceration. When a parent is imprisoned for a long term and cannot provide the customary parental care and guidance, the trial court must consider the extent to which the imprisoned parent has made reasonable attempts to contact and maintain an ongoing relationship with the child. The sufficiency of those efforts is for the trial court to determine. *In re Adoption of F.A.R.*, 242 Kan. 231, 236, 747 P.2d 145 (1987).

Mother contends that she made substantial efforts to fulfill her obligations to her son despite her incarceration. But Mother cites only her participation in two case plan meeting telephone calls, sending letters to M.H. and the KVC case manager, and participating in the trial by telephone.

The record shows that in the seven months between the date that M.H. was placed in the State's custody and the date of the termination trial, Mother sent M.H. one letter, sent his case worker one letter, and participated in two teleconferences which were initiated by M.H.'s case worker. The record does not reflect any attempt by Mother to communicate with M.H. during the nearly two years that he lived with G.B.'s family. At trial, Mother presented no evidence or statements showing any bond with M.H., her awareness and involvement in his treatment or care, or any feelings for her son. We

7

easily find clear and convincing evidence in the record that Mother did not make reasonable attempts, even given the limitations imposed by her prison conditions, to contact and maintain a relationship with her son.

*Unfitness in the foreseeable future*

Mother claims, essentially, that because she participated in the case plan and the six-month review by conference calls and expressed an ongoing interest in M.H.'s well-being, the district court erred in finding that her circumstances are unlikely to change in the foreseeable future. She contends that because she made progress after M.H. was adjudicated a CINC in 2009 and was able to regain custody of him, she has shown that she could give him a stable and nurturing home.

Mother fails to recognize that she is not in a position to reintegrate with M.H., and he is no longer six years old. M.H. is 13 years old with significant emotional, mental, and behavioral issues that require sustained care and support. Mother is in a federal prison in Texas. She claims she could be released from prison as early as 2020, instead of serving her whole sentence until approximately 2023, but she provided no evidence at trial regarding an early release date.

Regardless of Mother's purported release date, she fails to address the significance of an additional three to four years in M.H.'s life without the permanency and stability that are in his best interests. *In re M.H.*, 50 Kan. App. 2d at 1170-71. As the State points out, her release date, even if in 2020, means that M.H. will be nearly 17 years old, and this is the earliest she could begin to work toward reintegration. Viewed in the light most favorable to the State, and especially from M.H.'s perspective, the next three to four years are the foreseeable future. We find clear and convincing evidence that Mother's condition of unfitness is unlikely to change in the foreseeable future.

8

*The best interests of the child*

The district court is in the best position to make findings on the best interests of the child, and we will not disturb its judgment absent an abuse of judicial discretion. See *In re Marriage of Rayman*, 273 Kan. 996, 999, 47 P.3d 413 (2002). A judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013). When determining if terminating parental rights is in the best interests of a child, "the court shall give primary consideration to the physical, mental and emotional health of the child." K.S.A. 2016 Supp. 38-2269(g)(1).

Mother argues that M.H.'s best interests are served by fostering a relationship with her and Father. She also claims that there was no evidence that M.H.'s mental needs could best be served by terminating Mother's parental rights. In making these two arguments, Mother fails to acknowledge that the record reveals she made little effort in fostering a relationship with M.H. after he went into the State's custody, and the record is silent as to any efforts prior to that. She did not take advantage of her opportunity at trial to show that she had any relationship with M.H. before she went to prison, and she did not demonstrate that she could best meet his needs from prison. See *In re D.T.*, 30 Kan. App. 2d 1172, 1175, 56 P.3d 840 (2002) (demonstrating the unreasonableness of placing the wants of the parent over the best interests of the child).

The district court considered the physical, mental, and emotional health of M.H. The evidence showed a child who had been in and out of the system since he was five years old. Mother and Father placed M.H. with a custodian with dubious legal authority to try to meet his physical, mental, and emotional needs while they were taken into federal custody and sentenced to nine years in prison. M.H. expressed homicidal ideation regarding his parents and it was his life's mission to kill them, regardless of hurting other

9

people. M.H. had begun to act out his violent impulses. M.H. experienced suicidal ideation and had taken overt steps to commit suicide at least three times. He needed therapy and services, which required insurance more likely attainable through adoption than through a permanent custodian's social security benefit. M.H. refused to accept any communication from his parents, and his adamant position did not wane or waiver over time. While away from his parents and while receiving sustained, consistent services, he was learning to use coping skills and to enjoy his community. M.H. was doing well in school, wanted to start volunteering at an animal shelter, and had requested more therapy.

Mother argues that there is no evidence that KVC did anything to repair her relationship with M.H. That burden of maintaining the relationship, however, rests on Mother. The KVC case worker established the connection with Mother, invited her to participate in the case plan meeting and six-month review, and arranged for Mother to participate in the legal proceedings via teleconference. The KVC case worker communicated with M.H.'s therapist about the appropriateness of giving him Mother's one letter and followed the recommendation of that professional. Further, the case worker did subsequently ask M.H. if he wanted Mother's letter or to talk with her by phone, and M.H. refused.

Rather than demonstrate how the district court abused its discretion, Mother simply argues for an alternative interpretation of the evidence, which this court does not do. We cannot weigh conflicting evidence, pass on the witnesses' credibility, or redetermine questions of fact. *In re M.H.*, 50 Kan. App. 2d at 1170.

Mother cannot adequately care for M.H. or meet his substantial needs from prison. The two cannot be reintegrated, and, given M.H.'s negative feelings toward Mother and his refusal to have any communications with her, Mother cannot contribute to his well-being in any meaningful way. A reasonable person could conclude that the child is better off if a permanent placement goal of adoption is pursued to provide him with the

physical, mental, and emotional care and the support and stability he deserves and requires. We thus find no abuse of discretion in the district court's finding that termination of Mother's parental rights is in M.H.'s best interests.

*Adequacy of notice*

We note Mother's additional argument that the State deprived her of her statutory and constitutional rights to due process by failing to give her adequate notice of *other* grounds for terminating her parental rights. Specifically, Mother contends that the motion to terminate her parental rights did not allege specific facts to support an allegation that she failed to adjust her circumstances, as is required to terminate under K.S.A. 2016 Supp. 38-2269(b)(8) ("lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child"). We find it unnecessary to reach this issue because even assuming the correctness of Mother's argument, we find clear and convincing evidence that independently supports the termination of Mother's parental rights pursuant to K.S.A. 2016 Supp. 38-2269(b)(5), (conviction of a felony and imprisonment), which was adequately noticed, fully argued by the State at trial, and properly found applicable by the district court. Thus, we find no reasonable possibility that the error affected the outcome of this case. See *State v. Hurley*, 303 Kan. 575, 583-84, 363 P.3d 1095 (2016). We do not, however, condone the State's practice, demonstrated in this case, of noticing all the statutory grounds for termination of parental rights when it does not intend to pursue all of them.

Affirmed.

11